Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
Daniel E. Rhynhart (*Admitted Pro Hac Vice*)
Jason A. Kramer
BLANK ROME LLP
*A Pennsylvania LLP*
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-2646

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STRIKEFORCE TECHNOLOGIES, INC., 1090 King George's Post Road, Suite 603, Edison, New Jersey, 08837, <br><br> Plaintiff, <br><br> v. <br><br> WHITESKY, INC., 1825 S. Grant Street, Suite 250, San Mateo, CA 94402, <br><br> Defendant. | JURY TRIAL DEMANDED <br><br> Civil Action No.: 13-1895 (SRC) <br><br><br> **AMENDED COMPLAINT** <br><br><br> **(Electronically Filed)** |

Plaintiff StrikeForce Technologies, Inc. ("StrikeForce"), by its undersigned counsel, files this Amended Complaint against Defendant WhiteSky, Inc. ("WhiteSky"), and avers as follows:

## PRELIMINARY STATEMENT

1.      StrikeForce, a New Jersey-based company, has expended significant amounts of time, money and effort developing proprietary keystroke encryption security software, sometimes called "anti-keylogging" technology.  Personal computer users are vulnerable to fraud through "keylogging" surveillance spyware that has the capability to record their keystrokes (such as passwords, social security numbers, and credit card numbers) and send that information

1

to criminals.  StrikeForce's patent-pending GuardedID® software is designed to prevent keylogging through proprietary, innovative technology using encryption and out-of-band channels.

2.     In 2010, WhiteSky, a California-based software company selling an online security package, approached StrikeForce to discuss a partnership that would involve integrating StrikeForce's GuardedID anti-keylogger technology into WhiteSky's IDVault Identity Protection software platform (sometimes called "Identity Management Suite"), for sale to the marketplace as an integrated product.

3.     The parties subsequently executed a Software License and Development Agreement (twice amended), pursuant to which StrikeForce agreed to license its GuardedID software to WhiteSky to be included as a component of the WhiteSky IDVault platform.  The consolidated product containing both parties' software was defined in the Agreement as the "Desktop Products."  StrikeForce also agreed to perform additional software development services to integrate its GuardedID software into the Desktop Products.  StrikeForce's GuardedID software, plus its additional custom development, were collectively defined in the Agreement as the "Customized Software."  In exchange for StrikeForce agreeing to license its software and perform custom development work, WhiteSky agreed to market and sell the Desktop Products (defined to include StrikeForce's Customized Software) across North America over a three-year period, and to pay StrikeForce a royalty for every sale.

4.     Before entering into this business arrangement with WhiteSky, StrikeForce made sure that its valuable proprietary technologies were protected by, among other things, the following provisions: (i) StrikeForce retained all ownership and intellectual property rights in its Customized Software and work product under the Agreement; (ii) WhiteSky expressly

2

acknowledged in the Agreement that StrikeForce's Customized Software constituted StrikeForce's "trade secrets"; and (iii) the Agreement contained broad confidentiality provisions that protected StrikeForce's disclosures of proprietary information to WhiteSky as "Confidential Information."

5.      In reliance on these intellectual property and confidentiality protections, StrikeForce provided WhiteSky with its proprietary GuardedID software products and related Documentation.  StrikeForce then worked with WhiteSky for approximately one year developing and testing Customized Software that would, among other things, allow StrikeForce's GuardedID technology to be integrated into WhiteSky's IDVault software platform as a single download so that customers did not need to do separate installs, activations, or end user license agreements.  As part of that development effort, StrikeForce worked closely with WhiteSky's software developers and taught WhiteSky how many of StrikeForce's software functions, features and interfaces worked, so that WhiteSky could recreate some of those functions, features and interfaces (such as highlighting fields with color when anti-keylogging was activated and integrating another vendor's Software Development Kit ("SDK")) in its own software in order to create the necessary functionality for the Desktop Products.  StrikeForce performed that development work free of charge to WhiteSky, in reliance upon the anticipated benefits that StrikeForce was supposed to derive from the partnership under the Agreement.  Furthermore, StrikeForce shared its Confidential Information with WhiteSky in reliance upon WhiteSky's assurances that the Confidential Information would be used solely for the parties' joint benefit through the marketing of the Desktop Products under the terms of the Agreement.

6.     WhiteSky incorporated the StrikeForce Customized Software into the Desktop Products and proceeded to take the integrated Desktop Products to market, where WhiteSky has been highly successful with multiple clients, including over five million downloads.

7.     Although StrikeForce has fulfilled all of its obligations under the Agreement, WhiteSky has not honored its own.  After learning StrikeForce's Confidential Information and trade secrets, after allowing StrikeForce to invest a year's worth of intellect, money and labor in developing the Customized Software for WhiteSky's platform without payment for the development, and after selling the StrikeForce technology as part of the Desktop Products to attract major customers, WhiteSky has recently admitted that it is cutting StrikeForce out of the deal.  WhiteSky is in the process of (or has already completed) replacing StrikeForce with a competing product called "Antilogger SDK," manufactured by a company called "Zemana," based in Turkey, in violation of the Agreement and WhiteSky's repeated promises of exclusivity. WhiteSky is taking this action because StrikeForce refused to accede to WhiteSky's demand in late 2011 that it dramatically reduce its royalty fees for a third time—after StrikeForce had twice before agreed to reduce its fees at WhiteSky's request, in the interest of advancing the partnership—despite StrikeForce having no obligation to accept a mere fraction of the agreed-upon fees under the Agreement.

8.     Beginning in December 2012, the number of end-user installations for the Desktop Products started dropping dramatically (after having increased steadily every month since August 2010): from 5,000-20,000 end-user installations on average per day, down to only 40-80 per day at present.  A contract that was increasing in revenues from $470,000 in 2012 to anticipated revenues of over $600,000 a year going forward appears to have dropped to a tiny fraction of that amount (which WhiteSky has advised will be zero shortly), and there is still

4

nearly one year to go under the current contract term.  WhiteSky is not permitted to abandon StrikeForce as a component of its Desktop Products under the Agreement; it is obligated to continue using the StrikeForce Customized Software in its Desktop Products until the Agreement expires in 2014.

9.      Among other things, WhiteSky has been improperly accounting for the royalties it owes StrikeForce and, upon information and belief, underpaying StrikeForce.  Numerous end-users are still believed to be using the StrikeForce Customized Software as part of the WhiteSky Desktop Products; WhiteSky owes StrikeForce fees for this ongoing use, and is breaching the Agreement by failing to account for those users or pay fees to StrikeForce.

10.      Worse, as part of its efforts to replace StrikeForce's Customized Software with Zemana's Antilogger product, WhiteSky has misused and taken for its own benefit StrikeForce's Confidential Information and trade secrets, and also disclosed StrikeForce's Confidential Information and trade secrets to Zemana, in violation of the parties' Agreement.  Among other things, in a series of emails and telephone calls, WhiteSky showed Zemana how the StrikeForce anti-keylogging software worked in the Desktop Products, through screen shots and explanations of various features and functions in the StrikeForce Customized Software and Desktop Products. Then, on April 25, 2012, WhiteSky e-mailed Zemana a file containing StrikeForce's Customized Software, in its entirety, and instructed Zemana to copy, recreate and/or replicate the StrikeForce Customized Software so that the WhiteSky-Zemana joint product worked in the same manner as the Desktop Products containing the StrikeForce software had.  WhiteSky made it clear to Zemana that its software needed to work in precisely the same manner as StrikeForce's so that the transition from Zemana to StrikeForce would be seamless and go unnoticed by WhiteSky's tens of thousands of Comcast customer end users.

5

11.     WhiteSky was not permitted to give StrikeForce's Customized Software to Zemana.  The StrikeForce Customized Software is not publicly available; it is highly confidential and is available only to licensees, who are required to maintain confidentiality as part of the licensing agreement.  WhiteSky only possessed the StrikeForce Customized Software pursuant to the parties' Agreement, which defined that software as Confidential Information and StrikeForce's "trade secrets," and barred WhiteSky from using, displaying, or distributing the Customized Software for any purpose other than the agreed use under the Agreement—to market and sell the Desktop Products in North America—and from disclosing the Customized Software to any third party without StrikeForce's written consent.  WhiteSky never informed StrikeForce that it was using, disclosing or displaying the StrikeForce Customized Software to a competing anti-keylogging software company in Turkey.  StrikeForce did not know about, and certainly never gave its written consent to, WhiteSky's disclosures to Zemana.

12.     By illegally providing the StrikeForce Customized Software to Zemana, WhiteSky has caused StrikeForce serious harm.  Keystroke encryption is one of the most significant features of the StrikeForce Customized Software, which took StrikeForce years to develop through intensive research and development at great expense, which StrikeForce has kept secret, and which is highly valuable.  Until WhiteSky gave the StrikeForce Customized Software to Zemana, Zemana had no keystroke encryption feature in its product.  Yet only months after WhiteSky unlawfully provided the StrikeForce Customized Software to Zemana, Zemana debuted a new keystroke encryption feature that is remarkably similar to StrikeForce's. Zemana has been using this new keystroke encryption feature for commercial purposes with WhiteSky and its other customers (and in some cases, giving its software away for free), harming StrikeForce by the dilution of this valuable trade secret.

13.     In addition, WhiteSky has improperly continued using for its own benefit and disclosed to Zemana other StrikeForce know-how, methodologies and processes that StrikeForce taught WhiteSky in the course of their collaboration together under the terms of the Agreement. Among other things, StrikeForce explained and showed WhiteSky how to implement its CryptoColor® feature, and taught WhiteSky how to code that field highlighting feature for purposes of anti-keylogging functionality directly into the WhiteSky Desktop Products. StrikeForce also taught WhiteSky its proprietary methods for installing/uninstalling GuardedID from IDVault/ConstantGuard, for starting/stopping keystroke protection from IDVault/ConstantGuard in certain situations for WhiteSky's end users (like gaming applications) while the user is online without having to uninstall GuardedID because of keystroke conflicts, for handling signed drivers and certificates authenticating identity, for removing license tracking and verification on StrikeForce products, for allowing protection of Windows Login on GIDrk (Standard Version) even though it is a "Premium" feature, and other trade secrets. StrikeForce also built interfaces and the Software Development Kit ("SDK") for WhiteSky, to be used exclusively for the parties' joint benefit as part of the Desktop Products. WhiteSky has taken these StrikeForce trade secrets and Confidential Information for itself, for its own commercial gain, and is improperly using and disclosing them to StrikeForce's competitor Zemana, while excluding StrikeForce, without StrikeForce's written consent. Indeed, WhiteSky required that Zemana implement these StrikeForce features and functions in the Zemana software, including the SDK module, as part of the "seamless" transition from Zemana to StrikeForce. Zemana is now debuting these StrikeForce features in its own software that it is selling (or giving away) to the market and WhiteSky, causing great harm to StrikeForce.

14.     WhiteSky's unauthorized use and disclosure of the StrikeForce-owned trade secrets and Confidential Information is a breach of the parties' written Agreement, constitutes misappropriation of trade secrets under the New Jersey Trade Secrets Act, and is causing StrikeForce grave harm in the marketplace.   StrikeForce seeks preliminary and permanent injunctive relief enjoining WhiteSky's wrongful conduct, as well as monetary damages for the harm it has suffered.

## THE PARTIES

15.     Plaintiff StrikeForce is a corporation organized and existing under the laws of the State of Wyoming with its principal place of business located at 1090 King George's Post Road, Suite 603, Edison, New Jersey, 08837.

16.     Defendant WhiteSky is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 1825 S. Grant Street, Suite 250, San Mateo, CA 94402.

## JURISDICTION AND VENUE

17.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.     Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(a), because a substantial portion of the events giving rise to the causes of action described herein occurred in the District of New Jersey.  Furthermore, the parties' Agreement contains a "Governing Law and Forum" provision that "This Agreement is governed by and must be construed in accordance with the laws of the State of New Jersey…"  (Exhibit A at Section 13.12.)

## BACKGROUND

### A.      StrikeForce and WhiteSky.

19.      StrikeForce, based in New Jersey, is the world's leading provider of out-of-band authentication, keystroke encryption, and mobile security software products, securing millions of users worldwide.

20.      WhiteSky, based in California, is a software company marketing an online protection service that provides secure access to online accounts, through its IDVault Identity Protection software platform (sometimes called "Identity Management Suite").

21.      WhiteSky visited StrikeForce at its New Jersey offices on at least one occasion in 2010 to discuss a partnership that would involve integrating StrikeForce's proprietary GuardedID anti-keylogger technology into WhiteSky's IDVault Identity Protection software platform (sometimes called "Identity Management Suite"), for sale to the marketplace as an integrated product.

### B.      The Software License and Development Agreement.

22.      WhiteSky and StrikeForce executed their first agreement in May 2010, which was subsequently amended twice, resulting in the parties' Second Amended Software License and Development Agreement (the "Agreement"), signed in May 2011, which is the governing contract at issue in this action.  (*See* Agreement, attached as Exhibit A.)

#### 1.      The Parties' Obligations.

23.      Under the Agreement, StrikeForce agreed to license its GuardedID software to WhiteSky for integration into WhiteSky's IDVault software product, and to perform additional software development services to integrate its GuardedID product into WhiteSky's software platform.   StrikeForce's additional software customization work to integrate its GuardedID product into WhiteSky's platform was defined in the "Deliverables" section of the Agreement,

9

with attached Technical Requirements defining the customizations, and related Documentation. (*See* Exhibit A at Section 2.1 and exhibit A thereto.)

24.     This "specific customized development by StrikeForce of its GuardedID product to be delivered to WhiteSky," which included not just the GuardedID software but also custom interfaces that StrikeForce would develop to integrate its software into WhiteSky's platform, was defined in the Agreement as the "Customized Software."  (*See* Exhibit A at Section 1.4.)

25.     StrikeForce agreed to accept no development fees for its additional software customization work, in express "consideration for the agreement and opportunity."  (*See* Exhibit A at Section 5.1(d).)

26.     For its part, WhiteSky agreed to market and sell its IDVault software platform combined with StrikeForce's Customized Software (defined, collectively, as the "Desktop Products") both directly to consumers and to selected WhiteSky resellers, for a three year term expiring in May 2014.  (*See* Exhibit A at Sections 1.20, 4.2.)

27.     WhiteSky had an obligation to promote the distribution of the integrated Desktop Products for the three-year Term of the Agreement, "minimally through its normal marketing programs in all the regions WhiteSky sells its Desktop Products."  The Territory was defined as all of North America.  (*See* Exhibit A at Sections 1.20, 4.2(c), and exhibit B thereto.)

28.     WhiteSky agreed to provide StrikeForce with summary quarterly reports indicating the number of upgrades, renewals, and deactivations of End Users of the Desktop Products.  This permitted transparency into the number of customers for which StrikeForce would be owed a royalty fee from WhiteSky.  (*See* Exhibit A at Section 5.4.)  To date, WhiteSky has never provided StrikeForce with any quarterly report.

29.     WhiteSky agreed to pay StrikeForce royalty fees for every sale of the Desktop Products, a price that was renegotiated in two contract amendments after WhiteSky twice demanded that StrikeForce accept a lower payment, which StrikeForce agreed to do in the interest of the partnership (although it had no obligation to accept a lower payment).  Under the second round of modified payment terms, as set forth in the Agreement, WhiteSky agreed to pay StrikeForce either (i) ten cents ($0.10) per month for monthly End User subscriptions or one dollar ($1.00) annually for annual End User subscriptions, when the End User subscription paid to WhiteSky is greater than one dollar per month or twelve dollars annually; or (ii) ten percent (10%) of the subscription fee paid to WhiteSky when the End User subscription paid to WhiteSky is less than one dollar per month or twelve dollars annually.  StrikeForce had a right to opt out under an additional pricing provision if the ten percent fee was for subscription fees smaller than $0.40 per month or $4.80 annually.  WhiteSky had an obligation to collect End User fees and pay StrikeForce in monthly or yearly payments, depending on the End User's payment method.  (*See* Exhibit A at Sections 4.2(b), 5.1(c).)

30.     Although WhiteSky was permitted to sell its IDVault platform without the StrikeForce component, as it had been doing before it met StrikeForce, it was not permitted to use the StrikeForce Customized Software for itself or any other purpose during and beyond the term of the Agreement, nor was it permitted to substitute another anti-keylogger product for StrikeForce's GuardedID software components during the term of the Agreement.  Among other things, WhiteSky defined its IDVault software as the "Desktop Products," which was further defined to include the StrikeForce Customized Software.  WhiteSky agreed to promote the Desktop Products, including the StrikeForce Customized Software, for three years in North America.  (*See* Exhibit A at Recitals and Sections 1.5, 1.20, 3.1, 4.2, 6.1.)

31.     Furthermore, WhiteSky repeatedly requested and promised StrikeForce exclusivity for their partnership with respect to the Desktop Products they were going to take to market together.  For example, in one email, WhiteSky's founder Jerry Thompson made clear the parties' intention: "We would agree that for a fixed period of time we will not shop your technology, find lower pricing, and write you out of our solution and you would agree that for that same period of time you would not work against our initiative."   In another email, Thompson wrote, "Exclusivity: While StrikeForce is free to make partnership deals with any company, we would like an exclusive relationship as it relates specifically to integrating the GuardedID software with a desktop application to provide complete identity and credit protection."

32.     StrikeForce relied upon the terms of the Agreement and WhiteSky's promises, and lived up to its word by declining opportunities to bundle its software with competing credit-related ID theft products (such as Time Warner).  Yet, as detailed below, WhiteSky has not honored its end of the bargain.

**2.       StrikeForce's Ownership and Intellectual Property Rights.**

33.     StrikeForce retained all ownership rights in the Customized Software under the Agreement, including without limitation all "Intellectual Property Rights pertaining thereto," which would "remain vested in SFT [StrikeForce] at all times."   (See Exhibit A at Section 3.1(a).)

34.     The "Intellectual Property Rights" were defined broadly in the Agreement as "any and all of the following that may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including without limitation exclusive exploitation rights, copyrights and moral rights; (b) trade secret rights; (c) patent and industrial

property rights; (d) other proprietary rights in Intellectual Property of every kind and nature … "
(See Exhibit A at Section 1.13.)

35.     "Intellectual Property" was also defined broadly in the Agreement as "any and all Trademarks, know-how, methodologies, processes, technologies, analysis, models, techniques, proprietary information, specifications, protocols, schematics, diagrams, inventions (whether or not patentable), apparatuses, hardware, tools, devices, formulae, algorithms, software, software code (in any form including without limitation source code and object code or executable code), user interfaces, and other forms of technology."  (See Exhibit A at Section 1.12.)

36.     WhiteSky expressly acknowledged in the Agreement "that SFT [StrikeForce] owns and distributes in various forms the components of the Customized Software as part of SFT's [StrikeForce's] published and patent pending GuardedID products, and that the GuardedID software is not generally published and embodies SFT [StrikeForce] trade secrets." (See Exhibit A at Section 3.1(a); emphasis added.)

37.     The Agreement made clear that WhiteSky was acquiring no rights whatsoever in the StrikeForce Customized Software other than those expressly stated: "The Customized Software, along with any Enhancements or Maintenance Modifications thereof, shall remain the sole and exclusive property of SFT [StrikeForce].  Except as expressly granted hereunder, WhiteSky shall acquire no rights or licenses therein."  (See Exhibit A at Section 3.1(c).)

38.     WhiteSky was barred from using the StrikeForce Customized Software in any way except as specifically authorized by the Agreement, as follows: "Except as expressly authorized by this Agreement: (1) WhiteSky may not use, display, copy, modify, distribute, or reproduce the Customized Software; or (2) modify, transfer, lease, reverse engineer, sublicense,

decompile or disassemble the Customized Software.  SFT [StrikeForce] reserves all rights not expressly granted to WhiteSky hereunder."  (See Exhibit A at Section 3.1(b).)

39.     StrikeForce's Intellectual Property Rights and WhiteSky's corresponding obligations survive expiration or termination of the Agreement.  (See Exhibit A at Section 6.3(e).)

### 3.     Confidential Information and Nondisclosure Protections.

40.     The Agreement also contained broad confidentiality provisions that protected StrikeForce's disclosure of its confidential intellectual property to WhiteSky.  "Confidential Information" was defined broadly as "information that is disclosed … during the Term of this Agreement, including without limitation know-how, inventions, techniques, processes, algorithms, computer software programs, schematics, financial and business data, projections, marketing plans, product development plans, operational plans and details, and designs."

41.     WhiteSky agreed not to use StrikeForce's "Confidential Information for any purpose other than performance under this Agreement," and not to "disclose [StrikeForce's] Confidential Information to any third party without [StrikeForce's] written consent."   (See Exhibit A at Section 7.2.)

42.     StrikeForce's Confidential Information rights and WhiteSky's corresponding non-disclosure obligations survive expiration or termination of the Agreement.  (See Exhibit A at Section 6.3(e).)

### C.     The Parties' Performance Under the Agreement.

43.     In reliance on the terms of the Agreement, StrikeForce devoted significant time, money and resources to developing and testing the Customized Software in accordance with the Technical Requirements that would, among other things, allow StrikeForce's GuardedID

technology to be integrated into WhiteSky's IDVault software platform as a single download so that customers did not need to do separate installs, activations, or end user license agreements.

44.     In order to perform its obligations, StrikeForce provided WhiteSky full access to its proprietary GuardedID software products, the Customized Software, numerous question and answer sessions, detailed technology conferences, and related Documentation, subject to the broad intellectual property and confidentiality protections set forth in the Agreement.

45.     StrikeForce performed its customized software development work to integrate the parties' software products together for approximately one year—free of any cost to WhiteSky, for the benefit of the partnership, and in anticipation of significant future revenues (as stated by WhiteSky on several occasions)—in reliance upon, and in expectation of, the benefits that StrikeForce was supposed to derive from the partnership under the Agreement.

46.     In the course of this development work, StrikeForce worked closely with WhiteSky's software developers and taught WhiteSky how many of StrikeForce's software functions and features worked, so that WhiteSky could recreate those features in its own software as part of the Desktop Product.  It was at all times understood and agreed by the parties that the highly confidential information that StrikeForce was sharing with WhiteSky was to be used only for purposes of the Desktop Products (inclusive of the StrikeForce Customized Software) that were to be marketed for the parties' joint benefit under the terms of the Agreement.

47.     StrikeForce was successful in its delivery of customized interfaces and a Software Development Kit (SDK) that allowed its GuardedID software to be incorporated into WhiteSky's IDVault platform.  WhiteSky was pleased with StrikeForce's software development work, and

proceeded to take its IDVault product with the StrikeForce Customized Software integrated therein (the "Desktop Products") to market with various clients, including Comcast Corporation.

48.    In an email to Comcast, WhiteSky trumpeted the features of the StrikeForce technology now integrated into its software platform, as follows: "We believe that with the addition of the StrikeForce technology, the Identity Management Suite [Desktop Products] is the most comprehensive and powerful Identity Protection solution available for consumers.  Backed by … real time online protection and desktop protection against keyloggers in an easy to use and easy to install (5mb) software download, this offer would get widespread adoption from the Comcast community."   Comcast subsequently agreed to offer the integrated WhiteSky-StrikeForce product as part of its ConstantGuard Protection Suite for Xfinity Internet customers.

49.    WhiteSky posted press releases to its website (www.whitesky.com) announcing this Comcast launch for the Desktop Products, including an August 4, 2011 release titled "White Sky Launches Extensible Services Platform (ESP) With Comcast as First Customer," and an August 10, 2011 release titled "StrikeForce Technologies Embedded as Key Component of White Sky's Extensible Services Platform (ESP)."   The latter press release, posted on WhiteSky's website, states as follows:

> **Edison, NJ - August 10, 2011** - StrikeForce Technologies (OTCQB: SFOR) (PINKSHEETS: SFOR), an innovator in the prevention of online Identity Theft and Data Breaches for enterprise, financial institutions, government and consumers, reports that its GuardedID® product has been incorporated as the keystroke encryption and real time anti-keylogging component of White Sky's Extensible Services Platform™ (ESP), a robust online security package being launched nationwide to White Sky's clients, including one of the U.S.'s leading providers of online entertainment, information and communications products and services. StrikeForce brings unparalleled protection against computer hackers and data breaches to White Sky's innovative platform.
>
> White Sky's announcement of its first-of-its-kind security platform and details regarding its client launch, were first made public last week in an announcement that has the online security world commending White Sky's ESP as the most

powerful real-time security offer for users looking to protect their identity, prevent online fraud and secure their personal information. The platform provides a unique combination of strong authentication, anti key-logging protection, secure browsing and transaction security.

"Market-leading consumer brands realize the need to provide comprehensive protection services for their customers to combat the ever-increasing threats of identity theft, online fraud and computer virus and security. We are committed to working with best of breed software publishers and security service providers to continue to enhance our platform" said Jerry Thompson, White Sky's Founder. "Having StrikeForce Technologies' GuardedID product as an OEM component for keystroke encryption in our offering gives us and our clients confidence that we are providing the tools needed to defend against keylogging malware," said Thompson.

"White Sky has launched a groundbreaking product and our inclusion as the anti-keylogging and anti-hacking keystroke encryption element of their platform is a great validation of our technology advancements," said Mark Kay, StrikeForce Technologies' CEO. "White Sky's relationship with large consumer brands allows StrikeForce to receive an initial fee for the downloads, as well as recurring monthly revenues, making this potentially one of the strongest single revenue producers for our GuardedID product at this stage."

50.     As Comcast began offering the integrated WhiteSky-StrikeForce software suite (called "ConstantGuard") to its Internet customers, tens of thousands of those customers began installing the Desktop Products on a daily basis, resulting in literally millions of installations in only one year.  WhiteSky had an obligation to provide StrikeForce with monthly royalty and summary quarterly reports indicating the number of End Users, and to collect the fees and pay StrikeForce in monthly payments.

51.     Initially, WhiteSky provided the monthly royalty reports and paid fees to StrikeForce, although it never provided the quarterly reports.  On two occasions, WhiteSky demanded that StrikeForce reduce its fees going forward, even though those fees were heavily negotiated and expressly stated in the parties' contract, supposedly because the volume of the Comcast business was unanticipated.  StrikeForce grudgingly agreed to do so, in an effort to be a good partner.

**D.     WhiteSky's Multiple Breaches, Misappropriation of Trade Secrets, and Disclosure of Confidential Information.**

52.     By late 2011, however, WhiteSky let its greed get out of hand and pushed things too far.  WhiteSky demanded that StrikeForce drastically reduce its fees for a third time, or be replaced with a cheaper (unnamed) competitor.  StrikeForce was shocked by this threat to be replaced, and refused to give in this time.  This was the height of unfairness, after StrikeForce had worked for approximately one year developing the Customized Software to smoothly integrate its anti-keylogger technology into WhiteSky's platform, after StrikeForce had taught WhiteSky how many of StrikeForce's software functions and features worked, and after WhiteSky had obtained the Comcast business in large part through promotion of its inclusion of the StrikeForce Customized Software in the Desktop Products.  StrikeForce responded by warning WhiteSky that any attempt to replace it during the three-year term, to disclose StrikeForce's intellectual property to any third party, or to use its Customized Software for any purpose other than that agreed upon, would be a breach of the Agreement.

53.     Although WhiteSky appeared to back down and business continued as usual for most of 2012, the number of End User customers began dropping precipitously in December 2012.  StrikeForce watched the numbers dwindle from 5,000-20,000 installations per day to only 40-80 per day, and WhiteSky has advised that the number will be down to zero shortly.  The corresponding royalty fees have been reduced (after having grown steadily every month for over two years, from August 2010 through November 2012), without any notices, e-mails, or calls from WhiteSky notifying StrikeForce of any change in the partnership.

54.     Meanwhile, Comcast continues to advertise its ConstantGuard product (the WhiteSky Desktop Products) with anti-keylogging protection.   In early 2013, WhiteSky informed StrikeForce that it was still using StrikeForce's Customized Software, although it was

18

in the process of implementing replacement software.  StrikeForce's own investigation, however, revealed that this information was inaccurate and misleading; in reality, WhiteSky had secretly begun replacing StrikeForce's Customized Software with the Turkish product Antilogger SDK months earlier.  This was a brazen violation of the parties' Agreement and WhiteSky's repeated promises.

55.     StrikeForce has done everything it was asked to do under the Agreement, and WhiteSky has repeatedly commented on its satisfaction with StrikeForce's performance. WhiteSky simply wishes to replace StrikeForce with a cheaper substitute, even though the Agreement runs through 2014 and WhiteSky is not permitted to take such action.  By attempting to phase StrikeForce out of the Desktop Products and replace it with a substitute anti-keylogger product—an act that is barred by the parties' Agreement and promises—before the three-year term has expired and without terminating the Agreement, and by abandoning its obligations to market the Desktop Products inclusive of StrikeForce's Customized Software throughout North America for the full three-year term of the Agreement, WhiteSky is depriving StrikeForce of the benefit of the bargain with respect to anticipated royalty fees.  Furthermore, WhiteSky is improperly accounting for StrikeForce's royalty fees under the Agreement.  These illegal actions are harmful to a public company that provided future guidance to its investors based in part on these projected future revenues.

56.     Equally troubling, WhiteSky has violated the Agreement by misusing and taking for its own use, and illegally disclosing to Zemana, StrikeForce's Confidential Information and trade secrets.  Among other things, WhiteSky actually sent Zemana a copy of StrikeForce's Customized Software on April 25, 2012, and instructed Zemana to copy, replicate, and/or recreate the StrikeForce Customized Software.  WhiteSky informed Zemana that it was critical

and an absolute requirement for the WhiteSky-Zemana joint product to recreate the functionality of the previous WhiteSky-StrikeForce "Desktop Products" so that the transition from StrikeForce to Zemana was seamless for its Comcast customer end users.

57.     Before WhiteSky illegally provided the StrikeForce Customized Software to Zemana in April 2012, in violation of the Agreement, Zemana did not have keystroke encryption in its product.   After WhiteSky provided the StrikeForce Customized Software to Zemana, Zemana suddenly had keystroke encryption in its product in a matter of months, very similar to the StrikeForce keystroke encryption features and functions.  In addition, Zemana did not have a Software Development Kit ("SDK") in its product before WhiteSky sent it the StrikeForce software for replicating.   The StrikeForce GuardedID SDK was developed specifically for WhiteSky to be the Customized Software embedded in WhiteSky's IDVault product to produce the proprietary Desktop Products.  It took StrikeForce nearly a year to develop that SDK, yet after WhiteSky provided the StrikeForce Customized Software to Zemana, within a matter of months, Zemana also had the SDK in its product, which was required for WhiteSky to replace StrikeForce's Customized Software.  Zemana has been using its newfound keystroke encryption and SDK features for commercial purposes, with WhiteSky and in the marketplace, selling (and, in some instances, giving away for free) its software containing those features, devaluing the trade secrets and causing great harm to StrikeForce.

58.     WhiteSky has also illegally continued using for its own benefit components of StrikeForce's Customized Software, as well as StrikeForce know-how, methodologies and processes that StrikeForce taught WhiteSky in the course of their collaboration together under the terms of the Agreement.  Specifically, among other things, StrikeForce showed WhiteSky how to implement its CryptoColor feature (highlighting of browser text fields with color) for

purposes of anti-keylogging functionality, and taught WhiteSky how to code that feature directly into the WhiteSky Desktop Products. StrikeForce also taught WhiteSky its proprietary methods for installing/uninstalling GuardedID from IDVault /ConstantGuard, for starting/stopping keystroke protection from IDVault /ConstantGuard in certain situations for WhiteSky's end users (like gaming applications) while the user is online without having to uninstall GuardedID because of keystroke conflicts, for handling signed drivers and certificates authenticating identity, for removing license tracking and verification on StrikeForce products, for allowing protection of Windows Login on GIDrk (Standard Version) even though it is a "Premium" feature, and other trade secrets. StrikeForce also built interfaces and the SDK for WhiteSky, to be used exclusively for the parties' joint benefit as part of the Desktop Products.

59.    All of the aforementioned StrikeForce know-how, methodologies and processes constitute "Confidential Information" under the express terms of the parties' Agreement, and StrikeForce's GuardedID anti-keylogging product and process is patent pending and secret. WhiteSky has taken these StrikeForce trade secrets and Confidential Information for itself, for its own commercial gain, and is improperly using and disclosing them to StrikeForce's competitor Zemana, while excluding StrikeForce, without StrikeForce's written consent. WhiteSky's disclosures of StrikeForce's trade secrets and Confidential Information are threatening StrikeForce with imminent harm.

60.    WhiteSky's unauthorized use and disclosure of the StrikeForce-owned trade secrets and Confidential Information is a breach of the parties' Agreement and constitutes misappropriation of trade secrets under the New Jersey Trade Secrets Act, among other claims detailed below. StrikeForce seeks preliminary and permanent injunctive relief enjoining WhiteSky's wrongful conduct, as well as monetary damages for the harm it has suffered.

## COUNT I - BREACH OF CONTRACT

61.     StrikeForce hereby incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

62.     The Agreement is a valid contract entered into by StrikeForce and WhiteSky.

63.     StrikeForce has fully performed all of its obligations under the Agreement, including without limitation the delivery of the necessary components of its GuardedID software, the required additional software development, the Deliverables (Customized Software and related Documentation), Update Releases and Support Services.

64.     WhiteSky has breached its contractual obligations to StrikeForce under the Agreement by, among other things: a) WhiteSky's replacement of StrikeForce with a substitute anti-keylogging technology as a component of the WhiteSky Desktop Products; b) WhiteSky's use, display, copying, modification, distribution and reproduction of the StrikeForce Customized Software without payment of proper royalty fees; c) WhiteSky's unauthorized use and disclosure of StrikeForce's Confidential Information to Zemana, including without limitation WhiteSky's unlawful delivery of the StrikeForce Customized Software in its entirety to Zemana with instructions for Zemana to copy, replicate, and/or recreate the StrikeForce Customized Software, as well as WhiteSky's disclosure of StrikeForce's methodologies for the proprietary CryptoColor feature (field highlighting for keystroke encryption), for installing/uninstalling GuardedID from IDVault/ConstantGuard, for starting/stopping keystroke protection from IDVault/ConstantGuard, for handling signed drivers and certificates authenticating identity, for removing license tracking and verification on StrikeForce products, and for allowing protection of Windows Login on GIDrk (Standard Version) even though it is a "Premium" feature; d) WhiteSky's failure to market and sell the Desktop Products including the StrikeForce Customized Software for the entire three-year term of the Agreement; and e) WhiteSky's failure to properly account for,

report, and pay royalty fees for sales of the Desktop Products including the StrikeForce Customized Software.

65.     Despite requests by StrikeForce, WhiteSky has failed to comply with the terms of the Agreement.

66.     As a direct and proximate result of WhiteSky's breaches, StrikeForce has sustained actual damages.  Among other things, StrikeForce has lost the benefit of the bargain with respect to anticipated royalty fees.  StrikeForce has further lost exclusive use of its proprietary Confidential Information and trade secrets, which were developed at great expense to StrikeForce and which provide StrikeForce with its competitive edge in the marketplace. StrikeForce has no adequate remedy at law and is entitled to injunctive relief to prevent further injury.

**COUNT II -MISAPPROPRIATION OF TRADE SECRETS**
**UNDER NEW JERSEY TRADE SECRETS ACT, N.J.S.A. 56:15-1, ET SEQ.**

67.     StrikeForce hereby incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

68.     StrikeForce owns the Customized Software and Confidential Information— including StrikeForce's patent-pending GuardedID software and all of StrikeForce's methods, practices, techniques and know-how concerning the prevention of keylogging, innovative technology using encryption and out-of-band channels, the proprietary CryptoColor feature, proprietary methods for installing/uninstalling GuardedID from IDVault /ConstantGuard, for starting/stopping keystroke protection from IDVault /ConstantGuard, for handling signed drivers and certificates authenticating identity, for removing license tracking and verification on StrikeForce products, and for allowing protection of Windows Login on GIDrk (Standard Version) even though it is a "Premium" feature—which constitute trade secrets (the "Trade

Secrets") as defined by the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1 *et seq.*, because they constitute information (in the form of a formula, pattern, compilation, program, device, method, technique, and/or process) that: i) derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use; ii) is the subject of reasonable efforts under the circumstances to maintain their secrecy; and iii) would be highly difficult for a third party to acquire or duplicate.

69.     WhiteSky expressly acknowledged in the Agreement, Section 3.1(a), that StrikeForce's Customized Software is "not generally published and embodies SFT [StrikeForce] trade secrets."

70.     At all times relevant, StrikeForce took reasonable and adequate measures to protect the confidentiality of its Trade Secrets.  StrikeForce does not disclose its Trade Secrets to third parties without reasonable measures to protect their confidentiality.  StrikeForce only disclosed the Trade Secrets to WhiteSky under the protections of the express terms of the Agreement (which includes the confidentiality and nondisclosure provisions), which limit WhiteSky's ability to use and disclose StrikeForce's Trade Secrets.

71.     StrikeForce, by virtue of its ownership of the Trade Secrets, has the exclusive right to use and enjoy these Trade Secrets.

72.     Notwithstanding the foregoing, WhiteSky is using and disclosing to third parties the Trade Secrets without authorization from StrikeForce, and in violation of the agreements entered into between the parties, as detailed in the paragraphs above.

73.     WhiteSky has taken these StrikeForce Trade Secrets and Confidential Information for itself, for its own commercial gain, and is improperly using and disclosing them to StrikeForce's competitor Zemana, while excluding StrikeForce, without StrikeForce's written

consent.  WhiteSky's unauthorized use and disclosure of StrikeForce's Trade Secrets constitutes misappropriation of trade secrets under the New Jersey Trade Secrets Act.

74.     As a direct and proximate result of WhiteSky's misappropriation, StrikeForce has sustained actual damages.  Among other things, StrikeForce has lost the exclusive use of its Trade Secrets, which were developed at great expense to StrikeForce and which provide StrikeForce with its competitive edge in the marketplace.  WhiteSky's acts have been willful and malicious, entitling StrikeForce to exemplary damages, costs and attorneys' fees under the New Jersey Trade Secrets Act.

75.     In addition, WhiteSky's disclosures of StrikeForce's Trade Secrets and Confidential Information are threatening StrikeForce with imminent and irreparable harm in that WhiteSky's continued use and disclosure of StrikeForce's Confidential Information, Customized Software and Trade Secrets are diminishing the value of this information and StrikeForce's investment therein, and causing StrikeForce to suffer a loss of business.  In order for StrikeForce to be made whole, StrikeForce must regain the exclusive use of its confidential Trade Secrets, which form the basis of its competitive edge in the marketplace.  StrikeForce has no adequate remedy at law and is entitled to injunctive relief to prevent further injury.

## COUNT III -PROMISSORY ESTOPPEL

76.     StrikeForce hereby incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

77.     WhiteSky made the clear and unambiguous promises that it would not use or disclose the Confidential Information or the Customized Software except as expressly authorized by the Agreement, and that StrikeForce would be its exclusive anti-keylogging product, and it would only use the Customized Software in the Desktop Products they were going to take to market together.

78.     In reasonable and foreseeable reliance on this promise, StrikeForce provided the Confidential Information and Customized Software to WhiteSky for use in its Desktop Products.

79.     Furthermore, StrikeForce reasonably relied upon WhiteSky's promises of exclusivity, and lived up to this agreement, by declining opportunities to bundle its software with competing credit-related ID theft products.

80.     By its unauthorized use, disclosure, and retention of the Confidential Information and Customized Software, and by abandoning its promises of exclusivity and replacing StrikeForce with a competing anti-keylogging technology during the three-year term of the Agreement, WhiteSky has breached its promises to StrikeForce.

81.     As a direct and proximate result of its reasonable reliance on WhiteSky's promises, StrikeForce has sustained actual damages.  Among other things, StrikeForce has lost the benefit of the bargain with respect to its inclusion in the Desktop Products and anticipated royalty fees.  StrikeForce has further lost exclusive use of its proprietary information and trade secrets, which were developed at great expense to StrikeForce and which provide StrikeForce with its competitive edge in the marketplace.

82.     StrikeForce has no adequate remedy at law and is entitled to injunctive relief to prevent further injury.

## COUNT IV - UNJUST ENRICHMENT

83.     StrikeForce hereby incorporates by reference all preceding paragraphs of this Complaint as though the same were set forth at length herein.

84.     Through its unauthorized use, disclosure, and retention of the Confidential Information and Customized Software, WhiteSky received a significant benefit from and at the expense of StrikeForce.

85.     Because WhiteSky did not bargain for or otherwise compensate StrikeForce for the Confidential Information or Customized Software (to the extent it is being used in a manner unauthorized by the Agreement), which were developed by StrikeForce at its expense, WhiteSky has been unjustly enriched.  It would be unjust for WhiteSky to retain the benefit of the Confidential Information and Customized Software without paying to StrikeForce the value of the benefit conferred.

WHEREFORE, Plaintiff StrikeForce requests judgment in its favor and the following forms of relief:  i) the issuance of a preliminary and permanent injunction barring WhiteSky from using or disclosing StrikeForce's Confidential Information and intellectual property, including the Customized Software and Trade Secrets; ii) compensatory and punitive damages, plus pre- and post-judgment interest, costs, expenses and attorneys' fees, as may be permitted by law, and iii) such other further relief as may be just and proper.

Dated:  July 17, 2013                         Respectfully submitted,


                                By:        /s/ *David C. Kistler*
                                           Stephen M. Orlofsky
                                           David C. Kistler
                                           New Jersey Resident Partners
                                           Daniel E. Rhynhart (*Admitted Pro Hac Vice*)
                                           Jason A. Kramer
                                           BLANK ROME LLP
                                           *A Pennsylvania LLP*
                                           301 Carnegie Center, 3rd Floor
                                           Princeton, NJ 08540
                                           Telephone: (609) 750-2626

                                           *Attorneys for Plaintiff StrikeForce Technologies, Inc.*

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Plaintiff StrikeForce Technologies, Inc. hereby certifies that, to its knowledge, the matter in controversy in this action is not the subject of any other pending lawsuit, arbitration, or administrative proceeding.

Dated:  July 17, 2013                    Respectfully submitted,


By:      /s/ *David C. Kistler*
         Stephen M. Orlofsky
         David C. Kistler
         New Jersey Resident Partners
         Daniel E. Rhynhart (*Admitted Pro Hac Vice*)
         Jason A. Kramer
         BLANK ROME LLP
         *A Pennsylvania LLP*
         301 Carnegie Center, 3rd Floor
         Princeton, NJ 08540
         Telephone: (609) 750-2626

         *Attorneys for Plaintiff StrikeForce Technologies, Inc.*

## JURY DEMAND

Plaintiff StrikeForce Technologies, Inc. hereby demands a trial by jury of all causes of action so triable.

Dated:  July 17, 2013                    Respectfully submitted,

By:        /s/ *David C. Kistler*  
Stephen M. Orlofsky  
David C. Kistler  
New Jersey Resident Partners  
Daniel E. Rhynhart (*Admitted Pro Hac Vice*)  
Jason A. Kramer  
BLANK ROME LLP  
*A Pennsylvania LLP*  
301 Carnegie Center, 3rd Floor  
Princeton, NJ 08540  
Telephone: (609) 750-2626  

*Attorneys for Plaintiff StrikeForce Technologies, Inc.*